**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civ. A. No. 2:19-40 |
| | ) |
| KIMBERLY ANN LUCAS d/b/a | ) |
| FARMERS' INN, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION[1]

This action stems from claims by Plaintiff Animal Legal Defense Fund ("ALDF") that Defendant Kimberly Ann Lucas d/b/a Farmers' Inn ("Farmers' Inn") fails to provide adequate husbandry and veterinary care to animals in Farmers' Inn's custody.  (ECF No. 155.)  Specifically, ALDF alleges Farmers' Inn is a public nuisance under Pennsylvania law and that it has violated the Endangered Species Act ("ESA"), 16 U.S.C. §1531 *et seq*., by unlawfully taking endangered species; unlawfully possessing protected species; and unlawfully transporting protected species in interstate commerce.  Among other claims for relief, ALDF seeks a permanent injunction "that terminates all [of] Farmers['] Inn['s] ownership and possessory rights in its animals," prohibits "Farmers['] Inn from obtaining other wild animals," "[a]ppoint[s] a special master or guardian ad litem to identify reputable wildlife sanctuaries and to determine the most appropriate placement for the forfeited animals, consistent with the animals' best interests," and "[c]harge[s] the cost of transferring and rehoming the forfeited animals to Farmers['] Inn." (*Id.*)

Presently before the Court are the parties' partial cross-motions for summary judgment.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case.  Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

I.     __Relevant Procedural History__

ALDF commenced this action in January 2019 in which it asserted claims of public nuisance and violations of the ESA.  (ECF No. 1.)  In December 2020, ALDF sought leave to file a supplemental complaint to include additional allegations under the ESA related to a scarlet macaw acquired by Farmers' Inn after the lawsuit began.  (ECF No. 142.)  In granting leave to amend, this Court wrote:

> Scarlet macaws and their subspecies crosses are listed as either "endangered" or "threatened" under the ESA.  50 C.F.R. § 17.11(h).  While it is true that the final agency rule on which Farmers' Inn premises its futility argument allows for the "transport . . . [of certain listed scarlet macaw subspecies] and subspecies crosses . . . in interstate commerce in the course of a commercial activity . . . without a permit," 84 Fed. Reg. 6278; 6310 (Feb. 29, 2019), that rule applies only to those subspecies and subspecies crosses that are listed as "threatened" under the ESA.  Here, the Supplemental Complaint alleges that the scarlet macaw at issue is listed under the ESA and may be an "endangered" subspecies.  (ECF No. 142-6 ¶¶ 56, 118.)  Because the scarlet macaw housed at Farmers' Inn could be a member of the "endangered" subspecies, the aforementioned rule would not be applicable to its interstate transport.

(ECF No. 153.)   ALDF thereafter filed its Supplemental Complaint, which is the operative document.  (ECF No. 155.)

This matter proceeded through both fact and expert discovery and a deadline was established for dispositive motions. Farmers' Inn moved for partial summary judgment and submitted a supporting brief and a concise statement of material facts with supporting exhibits. (ECF Nos. 178-80.)  ALDF also filed a motion for partial summary judgment, submitting a brief in support, a concise statement of material facts with a supporting appendix, and two declarations. (ECF Nos. 181-86.)  ALDF also moved to exclude the expert testimony of Dr. Michael Briggs, Farmers' Inn's expert witness.  (ECF No. 175.)

Subsequently, ALDF filed a brief in opposition to Farmers' Inn's partial motion for summary judgment, responsive concise statement of material facts, appendix, and a declaration.

(ECF Nos. 207-10.)  Thereafter, Farmers' Inn filed a reply, a supplemental appendix, as well as objections[2] and a reply to ALDF's additional material facts.  (ECF Nos. 216-18.)

This Court granted ALDF's *Daubert* motion to the extent that Dr. Briggs attempted to offer opinions and testimony regarding the role of Farmers' Inn in the community as summarized on page six of his March 15, 2021 Report.  (ECF No. 219.)  ALDF's motion was otherwise denied.  (*Id.*)  The Court also granted ALDF's motion for sanctions and concluded that at trial, an adverse inference would be imposed that relates to Russell, a black leopard.  (ECF Nos. 220; 225.)

Having ruled on the motion for sanctions and the *Daubert* motion, this Court issued a new response briefing order relating to ALDF's partial motion for summary judgment.  (ECF No. 221.)  Farmers' Inn filed a brief in opposition and submitted along with it a responsive concise statement of material facts, two declarations, and a supporting appendix.  (ECF Nos. 227-31.)  ALDF filed a reply, a supplemental concise statement of material facts, supporting appendix, and a declaration.  (ECF Nos. 234-37.)  Farmers' Inn then filed objections and a response to ALDF's supplemental concise statement of material facts.  (ECF No. 238.)  ALDF later filed a notice of supplemental authority.  (ECF No. 239.)

## II.   Factual Background

### A.   Farmers' Inn

Farmers' Inn is owned and operated by Kimberly Ann Lucas.  (ECF No. 180 ¶ 1.)  Farmers' Inn houses and exhibits over 100 animals, some of which are endangered species.  (*Id.* ¶ 5.)  Currently, it possesses a ring-tailed lemur and a scarlet macaw, both of which are listed as

---

[2] Farmers' Inn objects to ALDF's supplemental statement of material facts because these facts were not previously asserted in ALDF's statement of undisputed material facts in support of its partial motion for summary judgment.  (ECF No. 238.)  The Court need not resolve this issue because the outcome of this decision would not change even if these facts are considered.

endangered by the United States Fish and Wildlife Service ("USFWS").  (*Id.* ¶ 6.)  It also houses two gray wolves, a species that was delisted as an endangered species by the Trump Administration.  (*Id.* ¶ 7.)  Farmers' Inn previously possessed two other ring-tailed lemurs, King Julian and Mr. Lemur, and a black leopard, all of which died while in Farmers' Inn's custody. (ECF No. 185 ¶¶ 6-7.)

The remaining animals at Famers' Inn are not endangered.  (ECF No. 180 ¶ 8.)  They include: three muntjac deer, a coyote, two red foxes, two black bears, nine whitetail deer, three fallow deer, two grey foxes, three Patagonian cavies, two coatimundis, three two-toed sloths, two fennec foxes, one dromedary camel, two lesser anteaters, two vervet monkeys, one African crested porcupine, three cougars, two bobcats, one black-backed jackal, one zebra, three kangaroos, one binturong, three Amazon parrots, one gold and blue macaw, two umbrella cockatoos, one Goffin's cockatoo, four sulcata tortoises, one leopard tortoise, six red-eared sliders, one chameleon, two river cooter turtles, one green iguana, one bearded dragon lizard, two guinea pigs, one lop-eared rabbit, five miniature donkeys, one Brahman bull calf, three alpacas, two silkie chickens, two geese, twenty-one goats, eleven lambs, one pheasant, five peacocks, and one Watusi cow.  (*Id.*)  In the past two years, twenty-four animals have died while in the custody of Farmers' Inn.  (ECF No. 185 ¶ 14.)

Farmers' Inn is licensed under the Animal Welfare Act ("AWA") as a "Class C Exhibitor" of animals.  (ECF No. 185 ¶ 3.)  It possesses a license from the United States Department of Agriculture ("USDA") to exhibit animals as well as a permit to do so from the Pennsylvania Game Commission ("PGC").  (ECF No. 180 ¶¶ 1-3.)

The USDA performs annual inspections of Farmers' Inn.  A July 2016 USDA Inspection Report found "no non-compliant items identified during this inspection."  (ECF No. ¶ 14.)  In

November 2016, the USDA performed a "focused inspection on the black bears only," and according to the inspection report, "no non-compliant items [were] identified during this inspection." (*Id.* ¶ 13.)  Likewise, in 2018 and 2019, no non-compliant items were identified.  (*Id.* ¶ 12; ECF No. 180-9.)

Similarly, the PGC performs annual inspections of Farmers' Inn.  In 2015, Farmers' Inn received eighteen pass marks and two "needs improvements."  (ECF No. 180 ¶ 22.)  The next year, Farmers' Inn received nineteen pass marks and one "needs improvement."  (*Id.* ¶ 21.)  Some animal's births, deaths, and acquisitions were not properly reported within ten days and a cockatoo was reportedly pulling its feathers.  (ECF No. 180-16.)  Farmers' Inn received fourteen "pass" marks, one "needs improvement," and two "fails" in 2017.  (ECF No. 180 ¶ 20.)  The two failed categories were related to signage and the cages not being appropriately locked.  (ECF No. 180-15.)  In 2018, Farmers' Inn received passing marks in all categories.  (ECF No. 180-14.)  PGC's inspection report in 2019 reflected nineteen "pass" marks and one "needs improvement."  (ECF No. 180 ¶ 18.)

Farmers' Inn's deer population is periodically inspected for Chronic Wasting Disease ("CWD") by the Department of Agriculture's Bureau of Animal Health and Diagnostic Services.  (*Id.* ¶ 28.)  The inspection reports reflect that Farmers' Inn's cervid herd is compliant and free from CWD.  (*Id.*)

The Wise Clinic is the attending veterinary clinic for the vast majority of the exhibited animals at Farmers' Inn.  (ECF No. 185 ¶ 30.)  Another veterinary clinic, the Veterinary Centers for America ("VCA"), treats its birds when asked to do so.  (*See id.* ¶ 32.)  Dr. Benjamin Wise of the Wise Clinic annually visits Farmers' Inn to perform "visual inspection[s]" and fecal exams.  (*Id.* ¶¶ 38, 40; ECF No. 230-8 at 17.)  He personally handles the animals when he vaccinates them.

(ECF No. 230-8 at 12-13.)  He performs immobilization exams of all animals except for the bears, mountain lion, and black leopard.  (ECF No. 230-8 at 12-15.)  He does not generally use "anesthesia or tranquilization to obtain diagnostic samples" as part of his practice.  (ECF No. 185 ¶ 46.)

ALDF has submitted the testimony of Kelley Bennett ("Bennett").[3] Mrs. Bennett is a resident of Lancaster, Pennsylvania and a member of ALDF.  (ECF No. 187-59 ¶¶ 1-2.)  She is a certified veterinary technician and an animal lover.  (*Id.* ¶ 3.)  Mrs. Bennett visited Farmers' Inn in October 2018.  (*Id.* ¶ 4.)  She was unable to enjoy her visit because of the conditions she observed, and she still feels distressed when thinking about the animals' treatment.  (*Id.*) Specifically, Mrs. Bennett observed filthy water and food in the animals' enclosures, inadequate overgrown makeshift enclosures that did not protect the animals from the elements, a lack of enrichment for the animals, no zoo staff attending to the animals, and animals being fed by customers.  (*Id.* ¶¶ 8-12.)  She was further concerned that the habitats for the wolves, ring-tail lemurs, tropical birds, and black leopard were too small.  (*Id.* ¶¶ 16-23.)

Farmers' Inn has submitted deposition testimony from four members of the community regarding their view of the value that Farmers' Inn brings to the community.  (ECF No. 179-26-176-29.)

---

[3] ALDF primarily relies on the declaration of Mrs. Bennett to demonstrate Farmers' Inn was a public nuisance; however, it also points to evidence in the record that other visitors were dissatisfied, including witness declarations, deposition testimony from various individuals who received complaints about the animals at Farmers' Inn, and reviews on Google, Yelp.com, GoDuBois.com, Facebook, and Trip Advisor.

**B.      Endangered Species at Farmers' Inn**

As discussed below, certain endangered species are in the custody of Farmers' Inn and are the subject of ALDF's partial motion for summary judgment regarding purported violations of the ESA.

　　　　1.   Scarlet Macaw

Around March 30, 2019, Farmers' Inn purchased a scarlet macaw named Scarlet from the Mt. Hope Auction in Millersburg, Ohio.  (ECF No. 185 ¶ 82.)  Scarlet arrived at Farmers' Inn with mild feather destructive behavior.  (*Id.* ¶ 83.)  In December 2020, Farmers' Inn sought treatment from the VCA for Scarlet's condition.  (*Id.* ¶ 90.)  Listed as concerns in VCA's report are "poor diet" and "feather picking."  (*Id.*)  It was further noted she had "mild hyperkeratosis of beak."  (*Id.* ¶ 94.)  Its records further reflect the need to root out the cause of her feather picking including whether it is behavioral, metabolic, infectious, nutritional, or some other cause.  (*Id.* ¶ 91.)  An x-ray, or radiograph, taken by VCA during Scarlet's visit showed lesions suggestive of atherosclerosis.  (*Id.* ¶ 105.)

The VCA veterinarian recommended transitioning Scarlet to a 75% pelleted and 25% mix of fresh fruit and nuts diet.  (*Id.* ¶ 103.)  Adding omega 3 fatty acids to Scarlet's diet was also recommended.  (*Id.* ¶ 104.)

As of April 2021, Scarlet's "body was completely bald," with feathers only on her tail and head.  (*Id.* ¶ 117.)

　　　　2.   Ring-Tailed Lemurs

Over time, three ring-tailed lemurs, King Julian, Mr. Lemur, and Mrs. Lemur, were in the custody of Farmers' Inn.  King Julian died in 2015 after developing an abdominal tumor.  (ECF No. 185 ¶ 142.)

7

In September 2016, following King Julian's death, Farmers' Inn acquired a two-year old lemur named Mr. Lemur.  (*Id.* ¶ 150.)  Famers' Inn developed a six-week plan to integrate Mr. Lemur and Mrs. Lemur into the same habitat.  (*Id.* ¶ 154.)  For the first two weeks, they were placed in the enclosure's divided portions with limited contact.  (*Id.*)  For the second two weeks, they were allowed to cohabitate during the day in the same enclosure but were separated at night.  (*Id.*)  For the final two weeks, they were placed in the same enclosure with "[o]ff and on" monitoring."  (*Id.*)  After this integration process was complete and when no one was present, Mrs. Lemur attacked Mr. Lemur.  (*Id.* ¶ 156.)  Mr. Lemur was taken to the Wise Clinic and administered Meloxicam and Enrofloxacin but was not given any pain medication.  (*Id.* ¶¶ 162-63.)  He later died from his injuries.  (*Id.* ¶ 157.)

Mrs. Lemur now lives alone.  (*Id.* ¶ 169.)  Farmers' Inn created a two-page primate enrichment plan for her.  (*Id.* ¶ 176.)  The plan does not include any provisions governing social grouping, guiding implementation of activities to encourage engagement in species-specific behaviors, or for rotating and revising its content.  (*Id.*)

### 3.  Black Panther

When a black panther named Russell arrived at Farmers' Inn in 2009, he had a noticeable limp.  (*Id.* ¶ 207.)  The Wise Clinic never physically examined Russell to determine the cause of his lameness.  (*Id.* ¶ 218.)  Instead, it assumed his limp was related to an earlier declawing or to osteoarthritis.  (*Id.* ¶ 207.)  Russell never received pain medication for his limp.  (*Id.* ¶ 222.)

While at Farmers' Inn, Russell was placed on an enrichment plan and activities were conducted in accordance with this plan a few times a week.  (*Id.* ¶ 262.)  In November 2018, Russell developed a spot on his tail, where he lost his hair and developed skin redness.  (*Id.* ¶ 223.)

Without a physical examination, he was prescribed Prednisone by Dr. Wise, but the spot began to get bigger. (*Id.* ¶¶ 227-28.)

On June 4, 2020, staff noticed that Russell was not eating much and "seem[ed] weak." (*Id.* ¶ 244.) The next day Russell had to be hand fed. (*Id.* ¶ 245.) On June 7, 2019, Russell stopped eating entirely. (*Id.* ¶ 246.) He was ultimately euthanized on June 9, 2020. (*Id.* ¶ 247.)

### C.   The Parties' Conflicting Expert Testimony

ALDF has submitted the expert reports Dr. Valerie Johnson and Dr. Laura Boehler. Dr. Johnson opines that Farmers' Inn has "inadequate knowledge and training to care for any of the variety of species" in its possession. (ECF No. 183-1 at 3.) She further concludes that Farmers' Inn repeatedly failed to recognize signs of illness and provide appropriate husbandry for its exotic species; that its employees had no training or experience in exotic animal husbandry contributing to the failure to recognize signs of illness in the animals at this facility; and that Dr. Wise lacked the expertise to treat exotic species and offer advice on animal husbandry. (*Id.* at 6-7.) In her rebuttal report she notes that the seed-based diet given to the birds at Farmers' Inn was "completely inappropriate" and the treatment of Russell's skin lesson fell below the standard of care.[4] (ECF No. 183-3.)

Dr. Boehler, likewise, concludes that Farmers' Inn fell below the standard of care by not regularly providing the animals with care or treating their injuries; not performing anything more than annual visual examinations; keeping insufficient records; using Dr. Wise, who lacked the veterinary knowledge to treat the animals; providing limited environmental enrichment for its animals and feeding them nutrient deficient diets. (ECF No. 184-1.) Additionally, Dr. Boehler opines that the scarlet macaw's seed-based diet was damaging her health, her cage was too small,

---

[4] ALDF is not moving for summary judgment on any claims related to wolves.

she was given insufficient enrichment, she should not be housed alone, and she was not being properly treated for atherosclerosis lesions.  (*Id.*; ECF No. 184-2.)  Dr. Boehler also concluded that Mrs. Lemur was given deficient nutrients and enrichment living in isolation in an overly dark enclosure, King Julian received inadequate medical treatment, and the plan for the integration of Mr. and Mrs. Lemur was woefully deficient.  (ECF Nos. 184-1; 184-3.)

Farmers' Inn's expert, Dr. Briggs, conversely opines that the animals' food is fresh and species appropriate, the medical care that the animals receive at Farmers' Inn is "entirely proper," and the animals' enrichment "meets or exceeds the standard of care."  (ECF No. 231-10.) Specifically, he found that Scarlet's diet was appropriate, that she received appropriate behavioral enrichment, that Farmers' Inn comported with the applicable standard of care by seeking help from and following the recommendations of an avian specialist, and that her enclosure was appropriate. Dr. Briggs opined that King Julian received appropriate care consistent with the applicable standard, that the ring-tail lemurs' enrichment plan was consistent with general accepted husbandry practices, and their housing was appropriate.  He further found that Russell's treatment was consistent with generally accepted veterinary and husbandry practices and that Farmers' Inn relied on a veterinarian's judgment, which was appropriate.

In short, the parties' experts have presented conflicting and contradictory evidence about the adequacy of the treatment of animals at Farmers' Inn and whether they were harmed or harassed as a result of the conduct of Farmers' Inn.[5]

---

[5] In addition to these conflicting expert opinions, the record includes numerous other genuine issues of material fact.  By way of example only, the parties disagree about the composition of Scarlet's diet and the amount of sunlight Mrs. Lemur receives from her new Treehouse/ Sun Porch.

III.     **Standard of Review**

As the Federal Rules of Civil Procedure provide, summary judgment must be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Id.* (internal citation omitted). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *Nat'l State Bank v. Fed. Rsrv. Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

IV.   **Discussion**

Farmers' Inn has moved for partial summary judgment on ALDF's public nuisance claim as well as ALDF's claim that it unlawfully transported the scarlet macaw and engaged in an unlawful taking and had unlawful possession of its gray wolves.  ALDF also seeks partial summary judgment on its public nuisance claim and its claim that Farmers' Inn engaged in an unlawful take of protected animals including the scarlet macaw, black leopard, and ring-tailed lemurs.

For the reasons that follow, Farmers' Inn's motion will be granted and ALDF's motion will be denied with respect to ALDF's public nuisance claim.  Both motions will be otherwise denied.

A.     **ALDF's Public Nuisance Claim**

Both parties have moved for summary judgment on ALDF's public nuisance claim. Farmers' Inn contends that ALDF's public nuisance claim is factually and legally unsupportable because (1) the zoo is not regarded as a public nuisance in the community; (2) ALDF lacks fact witnesses to prove its claim; (3) substandard animal care does not constitute an injury to a public right, which is necessary for there to be a public nuisance; (4) the Pennsylvania Game Code cannot form the basis for a public nuisance; and (5) Farmers' Inn had clean PGC, USDA, and Cervid inspection records.  (ECF No. 179.)  Alternatively, it argues that even if Pennsylvania were to recognize a cause of action for public nuisance based on the facts of record, Farmers' Inn maintained a safe and healthy environment for its animals and provided adequate veterinary care. (ECF No. 227.)

In turn, ALDF contends that it is entitled to summary judgment in its favor on its public nuisance claim.  It argues that the staff at Farmers' Inn did not have adequate education, training, or knowledge to maintain a safe or healthy environment for the animals and the Wise Clinic

provided inadequate veterinary care.  (ECF No. 207.)  It contends that this conduct represents violations of the Pennsylvania Game Code.  ALDF asserts that (1) Pennsylvania's public nuisance law preserves the public's right to protect animals as demonstrated by the Pennsylvania Supreme Court's decision in *Pennsylvania Society for Prevention of Cruelty to Animals v. Bravo Enterprises*; (2) violations of the Pennsylvania Game Code support a common law public nuisance claim; (3) claims for public nuisance do not rise or fall on the number of witnesses; and (4) a claim for public nuisance can be predicated on an aesthetic injury.  (ECF No. 182.)

Generally speaking, a public nuisance is one that "affects health, safety or morals." *SPTR, Inc. v. City Phila.*, 150 A.3d 160, 167 (Pa. Commw. Ct. 2016) (quoting *Blue Mountain Pres. Ass'n v. Eldred*, 867 A.2d 692, 705 (Pa. Cmwlth. Ct. 2005)).  "A public nuisance is 'an unreasonable interference with a right common to the general public,' such as the right to clean public water and fresh air in public spaces." *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 220 (3d Cir. 2020) (quoting *Phila. Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 315 (3d Cir. 1985)).  Specifically, "[a] public nuisance is an inconvenience or troublesome offense that annoys the whole community in general, and not merely some particular person, and produces no greater injury to one person than to another—acts that are against the well-being of the particular community—and is not dependent upon covenants." *SPTR, Inc.*, 150 A.3d at 167 (quoting *Blue Mountain Pres. Ass'n*, 867 A.2d at 704).

Pennsylvania has adopted the Restatement (Second) of Torts § 821B regarding public nuisance claims.  *Lloyd v. Covanta Plymouth Renewable Energy, LLC*, No. CV 20-4330, 2022 WL 407377, at *2 (E.D. Pa. Feb. 10, 2022) (citing *Machipongo Land & Coal Co. v. Dep't of Env't Prot.*, 799 A.2d 751, 773 (Pa. 2002)).  Section 821B provides that:

> (1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Id.* (quoting Restatement (Second) of Torts § 821B).

Here, ALDF contends that Famers' Inn has created a public nuisance by operating its facility in violation of 58 Pa. Code §§ 147.281 and 147.287. Section 147.281 states in relevant part that "[t]his subchapter relates to safeguards for public safety, humane care and treatment, adequate housing and nutrition, sanitation, safety, acquisition and disposal of wildlife and exotic wildlife held as part of a menagerie." Section 147.287 provides in part that "[w]ildlife shall be kept free from parasites, sickness or disease. If sick or unsightly, wildlife shall be removed from public display." ALDF relies on *Pennsylvania Society for Prevention of Cruelty to Animals v. Bravo Enterprises*, 237 A.2d 342 (Pa. 1968), as precedent for its assertion that violation of an animal cruelty statute forms the basis for a public nuisance claim.

"To sustain a private claim on a public nuisance theory, 'a plaintiff must have suffered *a harm of greater magnitude and of a different kind* than that which the general public suffered.'" *Baptiste*, 965 F.3d at 221 (quoting *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000)) (emphasis added). Typically, a plaintiff does so by showing that their particular property sustained an injury although public nuisance is not strictly limited to such a showing. *Id. But see Pa. Soc. for Prevention of Cruelty to Animals*, 237 A.2d at 348 ("[A] public nuisance may be enjoined at the behest of a private citizen or group of citizens, if . . . their property or civil

14

rights[] are specifically injured by the public nuisance over and above the injury suffered by the public generally").

ALDF asserts Mrs. Bennett and numerous other visitors deemed Farmers' Inn to be a public nuisance.  (ECF No. 207 at 15 n.3.)  Notably, as visitors to Farmers' Inn,  each of the complaining parties were business invitees.  In general, courts in Pennsylvania have been unwilling to find a claim for public nuisance lies where a plaintiff sustained a harm as a business invitee.  *See Ricchiuti v. Home Depot, Inc.*, 412 F. Supp. 2d 456, 460 (E.D. Pa. 2005) (finding no action for public nuisance lied where the plaintiff sustained injuries from falling in a Home Depot parking lot).  *But see Commw. ex rel Preate v. Danny's New Adam & Eve Bookstore*, 625 A.2d 119, 122 (Pa. Commw. Ct. 1993) (explaining "[c]ompetent evidence exists in the record to support the trial court's conclusion that sexual conduct, occurring [on the adult book store's] premises, could lead to the spread of HIV which may result in AIDS" and thus, there was a viable claim for public nuisance).

Further, ALDF has not cited any decisions in which a court has recognized a private claim for public nuisance based on violations of 58 Pa. Code §§ 147.281 or 147.287 and the Court's independent review uncovered no such cases.  Further, Part III of Title 58 of the Pennsylvania Code relates to the Pennsylvania Game Commission and the scope of Subsection 147, which relates to special permits, provides that  "[t]his chapter regulates the activities of persons who apply for, receive or conduct activities under the authority of a permit issued under the act…" As discussed previously, Farmers' Inn possesses a permit from PGC and the PGC conducts annual inspections of Farmers' Inn.

Even assuming a private claim could be premised on a violation of these regulations and brought by a business invitee, ALDF has not put forth sufficient evidence from which a reasonable

factfinder could conclude that ALDF suffered a harm of a greater magnitude and of a different kind than that of the general public. *See Muehlieb v. City of Phila.*, 574 A.2d 1208, 1212 (Pa. Commw. Ct. 1990) (dogs barking loudly enough to interrupt a church service was a public nuisance).

Moreover, although the Supreme Court of Pennsylvania found a violation of an animal cruelty criminal statute could serve as a basis for a public nuisance claim in the landmark case on which ALDF relies, *Pennsylvania Society for Prevention of Cruelty to Animals v. Bravo Enterprises*, it ultimately concluded that the plaintiff could not prevail. *Pa. Soc. for Prevention of Cruelty to Animals*, 237 A.2d at 360. In so ruling, the Supreme Court of Pennsylvania reasoned, in part, that the plaintiff had not demonstrated that it "enjoy[ed] any greater property right in the prevention of such offenses or suffer[ed] injury to any greater degree than the general public when violations of the law relating to cruelty to animals occur." *Id.* at 349.

ALDF contends that it has satisfied this requirement because one of its members, Mrs. Bennett, has an interest in protecting animals and became upset upon viewing the conditions at Farmers' Inn. In order to prevail on a public nuisance theory, however, she must have suffered a unique harm. *Baptiste*, 965 F.3d at 221 ("While everyone in the community—including visitors, commuters and residents alike—may suffer from the discomfort of having to breathe polluted air in public spaces, the [plaintiffs] have identified cumulative harms that are unique to them and their fellow residents as homeowner-occupants or renters, such as the inability to use and enjoy their swimming pools, porches, and yards"). The record does not include any support for a unique harm, however, given that the only harm ALDF alleges is that like other visitors, Mrs. Bennett became upset and offended upon seeing the animals being poorly treated and in poor condition.

Problematic for ALDF is that this harm is no different than the harm any visitor to Farmers' Inn might sustain.

Because ALDF has failed to offer any basis that can sustain its public nuisance claim, Farmers' Inn is entitled to judgment in its favor.  Thus, Farmers' Inn's motion for summary judgment as to this claim will be granted, and ALDF's motion regarding this issue will be denied.

### B.    Unlawful Take of Scarlet Macaw, Ring-Tailed Lemurs, and Black Leopard

ALDF moves for summary judgment on its claim that in violation of the ESA, Farmers' Inn committed an unlawful take of the scarlet macaw, ring-tailed lemurs, and black leopard.  (ECF No. 182.)  It argues that Farmers' Inn harmed and harassed Scarlet by allowing her to eat an improper diet; confining her in solitary conditions with inadequate enrichment and with no opportunity for flight; and providing her with inadequate and untimely veterinary care that not only caused her health to deteriorate but it also worsened her condition.

Concerning the lemurs housed at Farmers' Inn, ALDF asserts that Farmers' Inn harmed and harassed King Julian by providing him with insufficient veterinary care; harmed and harassed Mr. Lemur by allowing him to be mauled to death and denying him adequate veterinary care for his injuries; and continues to harm and harass Mrs. Lemur through isolation, inadequate enrichment, housing her in an overly dark, dank enclosure and providing inadequate veterinary care.

Finally, as to Russell, the black leopard, ALDF asserts that Farmers' Inn harmed and harassed him by denying him timely and adequate veterinary care and adequate enrichment.  (*Id.*)  Among other bases, ALDF's claims are supported by the expert opinions of Dr. Valerie Johnson and Dr. Laura Boehler and the deposition testimony of Dr. Briggs and Dr. Wise.

Farmers' Inn denies these claims. (ECF No. 227.)  It notes that its expert, Dr. Briggs, has opined that each of these animals received a proper diet, enrichment, housing, and appropriate veterinary care.  Additionally, its integration plan for Mr. Lemur comported with the applicable standard, and the enclosure in which Mrs. Lemur is housed is appropriate with the proper amount of light.

Here, ALDF seeks summary judgment in its favor that Farmers' Inn violated the ESA by "taking" a scarlet macaw, ring-tailed lemurs, and a black leopard.  The purpose of the ESA is to protect species from extinction.  16 U.S.C. § 1531.  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174-75 (1978).  Pursuant to Section 11 of the ESA, "any person" may commence a civil suit to enjoin alleged violations of the ESA.  16 U.S.C. § 1540(g)(1).  "Congress included this provision to encourage private citizens to force compliance with the [ESA] for the benefit of the public interest."  *People for Ethical Treatment of Animals, Inc. v. Wildlife in Need & Wildlife in Deed, Inc.*, 4756 F. Supp. 3d 765, 776 (S.D. Ind. 2020) (quoting *Animal Welfare Inst. v. Beech Ridge Energy, LLC*, 675 F. Supp. 2d 540, 545 (D. Md. 2009)).

Section 9 of the ESA prohibits an unlawful taking of a listed species.  The term "[t]ake" has been broadly defined by the ESA to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The Supreme Court has explained the term "take" covers "every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1994).

The USFWS has promulgated regulations defining the terms "harm" and "harass."  *Rowley v. City of New Bedford, Mass.*, 413 F. Supp. 3d 53, 56 (D. Mass. Sept. 24, 2019), *aff'd*, No. 19-2000, 2020 WL 6111190 (1st Cir. Sept. 24, 2020).  *See Graham v. San Antonio Zoological Soc'y*,

261 F. Supp. 3d 711, 738 (W.D. Tex. 2017) (explaining harm is different than harass).  "Harm"

means any act "which actually kills or injures wildlife."  50 C.F.R. § 17.3.  The term "harass"

encompasses

> an intentional or negligent act or omission which creates the likelihood of injury to
> wildlife by annoying it to such an extent as to significantly disrupt normal
> behavioral patterns which include, but are not limited to, breeding, feeding, or
> sheltering. This definition, when applied to captive wildlife, does not include
> generally accepted:
>
> (1) Animal husbandry practices that meet or exceed the minimum standards for
> facilities and care under the Animal Welfare Act,
>
> (2) Breeding procedures, or
>
> (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when
> such practices, procedures, or provisions are not likely to result in injury to the
> wildlife.

*Id.*

The term "harass" has "a different character when applied to an animal in captivity than

when applied to [an] animal in the wild."  *People for the Ethical Treatment of Animals, Inc. v.*

*Miami Seaquarium*, 189 F. Supp. 3d 1327, 1350 (S.D. Fla. 2016)).  In fact, "[t]he regulatory

definition of 'harass' is intended 'to exclude proper animal husbandry practices that are not likely

to result in injury from the prohibition against 'take.'"  *Animal Legal Def. Fund v. Olympic Game*

*Farm, Inc.*, No. C18-6025RSL, 2022 WL 683210, at *2 (W.D. Wash. Mar. 8, 2022) (quoting

Captive-bred Wildlife Regulation, 63 FR 48634-02, 48636 (Sept. 11, 1998)).  This is true because

"Congress chose not to prohibit the mere possession of lawfully-taken listed species in [S]ection

9(a)(1) of the Act."  *Id.* (quoting Captive-bred Wildlife Regulation, 63 FR 48634-02).

ALDF bears the burden of proof to demonstrate an ESA violation. *See Graham*, 261 F.

Supp. 3d at 741.  Moreover, "[w]hen offering a standard other than the AWA against which

defendants' conduct is to be measured, plaintiff must show that it has been 'generally accepted,'

meaning that it applies to the care or facilities at issue and that it has been widely adopted and accepted. *Animal Legal Def. Fund*, 2022 WL 683210, at *4 (citing *Hill v. Coggins*, 423 F. Supp. 3d 209, 221 (W.D. N.C. 2019) (following remand from the Fourth Circuit)).  It is worth noting that an agency determination that a zoo is in compliance with the applicable rules is not dispositive. *Animal Legal Def. Fund*, 2022 WL 683210, at *4.

As discussed herein, the parties have offered competing expert opinions and other testimony and evidence regarding the adequacy of the treatment of the endangered animals at Farmers' Inn and whether they were harmed or harassed as a result of the conduct of Farmers' Inn. Because the record is replete with genuine issues of material fact, the Court cannot conclude as a matter of law that Farmers' Inn violated the ESA.

For these reasons, ALDF's motion for summary judgment pertaining to its claim for unlawful taking must be denied.

### C.      Unlawful Take and Unlawful Possession of Gray Wolves

Farmers' Inn moves for summary judgment regarding ALDF's claims that it engaged in an unlawful taking and had unlawful possession of the gray wolves.  It contends that these claims are moot because the gray wolf was delisted as a protected species by the Trump Administration. (ECF No. 179.)  ALDF counters that a court has since vacated the applicable final rule in *Defenders of Wildlife v. U.S. Fish & Wildlife Serv*ice, No. 21-CV-00344-JSW, 2022 WL 499838 (N.D. Cal. Feb. 10, 2022). (ECF Nos. 207; 239.)

Earlier this year, the United States District Court for the Northern District of California vacated the final rule delisting the gray wolf as a protected species. *See Defs. of Wildlife*, 2022 WL 499838, at *15.  After this decision was rendered, the United States District Court for the Western District of Washington denied a jurisdictional argument similar to the position Farmers'

Inn asserts here.  *Animal Legal Def. Fund*, No. C18-6025RSL, 2022 WL 683212, at *4 (W.D. Wash. Mar. 8, 2022).  The USFWS has since relisted the gray wolf on its website as a protected species of which this Court takes judicial notice.[6]

Thus, as the gray wolf is a protected species under the ESA, Farmers' Inn's motion for summary judgment on ALDF's unlawful take and possession claims concerning the gray wolves will be denied.

### D.      Unlawful Transport of Scarlet Macaw

Farmers' Inn contends that it is entitled to summary judgment on ALDF's claim that it unlawfully transported a scarlet macaw.  (ECF No. 179.)  Farmers' Inn argues that ALDF's unlawful transport of the scarlet macaw fails because a year prior to Farmers' Inn's purchase of Scarlet, the USFWS, in a final ruling, determined that it was no longer prohibiting the interstate commerce of scarlet macaws.  (*Id.*)

The ESA makes it unlawful for any person to "possess, sell, carry, deliver, transport, or ship, by any means whatsoever" any protected species taken in violation of the ESA.  16 U.S.C. § 1538(a)(1)(D); *see also* 50 C.F.R. §§ 17.21(d), 17.31(a).  Scarlet macaws and their subspecies crosses are listed as either "endangered" or "threatened" under the ESA.  50 C.F.R. § 17.11(h). The final agency rule on which Farmers' Inn relies allows for the "transport . . . [of certain listed scarlet macaw subspecies] and subspecies crosses . . . in interstate commerce in the course of a commercial activity . . . without a permit."  84 Fed. Reg. 6278; 6310 (Feb. 29, 2019).

ALDF asserts Farmers' Inn is not entitled to summary judgment because ALDF is relying on the same final rule on which it relied in moving to supplement its Complaint to add this claim.

---

[6] Generally speaking, "information found on government websites is widely considered both self-authenticating and subject to judicial notice."  *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 259 (E.D. Pa. 2020).

Thus, it is ALDF's position that the law of the case governs.  (ECF No. 207.)  Even assuming it does not, however, ALDF asserts that Farmers' Inn has failed to meet its burden to show that Scarlet is a member of a threatened subspecies or cross and thus is not subject to permit because her subspecies is not ascertainable as a result of her severe feather plucking.

Farmers' Inn replies that ALDF has waived this claim because ALDF has advanced no evidence that Scarlet is an "endangered subspecies" through genetic testing or otherwise demonstrated that the FWS actually enforces this rule.  (*Id.* at 216.)  However, on summary judgment, Farmers' Inn bears the burden to show that Scarlet falls within one of those subspecies that are permitted to be transported without a permit.  Farmers' Inn has not offered any affirmative evidence to demonstrate she is within such a subspecies.  Therefore, Farmers' Inn's motion for summary judgment concerning the unlawful transport claim of a scarlet macaw must be denied.

## V.   __Conclusion__

Thus, for the reasons discussed in this opinion, ALDF's partial motion for summary judgment will be denied.  Farmers' Inn's partial motion for summary judgment will be granted as to the claim for public nuisance but will be denied in all other respects.  An appropriate order follows.

BY THE COURT:

Dated: March 31, 2022                    s/Patricia L. Dodge
                                         PATRICIA L. DODGE
                                         United States Magistrate Judge